Connecticut. I'm going to move to case number six. This is Appeal 22-3191, Horizon West Condominiums v. Travelers Indemnity Corporation of Connecticut. And Mr. Ganser, we're going to begin with you. Thank you, Your Honor. May it please the Court, I'm Mike Ganser from Milwaukee, Wisconsin. I represent the Horizon Homeowners Association. I'm joined today by about 15 people who own those condo units, some of those condo units. And we're all here to ask you today to reverse the district court's decision. The reason is this. This is an application of an insurance policy to a certain set of facts. I don't think the law is particularly unusual or anything here. It's just a matter of looking at this policy. Mr. Ganser, before you get too far down the road, may I clarify something, please? You are not appealing the district court's ruling that the individual unit owners are not proper plaintiffs here, are you? I am not. Okay. And you're also not appealing the district court's dismissal of the bad faith? I am not. Okay. Thank you. Clearly that is now arguable because that was dismissed. Yes. Okay. Just wanted to clarify. Thank you. But we're here to talk about, though, is this policy which is really what's an all-perils policy. And that is defined in the policy itself. It says that where a covered cause of loss is one in where the risks of direct physical loss are not otherwise excluded. So the bottom line here is that everything's included unless it's excluded. So I think that that gets us as the plaintiff appellants off to the first mark. And that is that I think the burden then shifts to the other side to say, what are the exclusions that apply here? And in this particular policy, what we see is kind of a hodgepodge. There's a haphazard and conflicting result here because what insurance policies do, and I'm sure almost any lawyer in this room would not do this, is that they just add portions to the main policy as exclusions or add-ons or whatever it happens to be, which gets you with kind of a sloppy document. And I think that's the case here. What we're talking about then is what does the defense hold as the reasons that this is excluded? Now, one thing that I would note, and this is located on the WIS-JANI report, that is the Report of Travelers, and in the appendix at 133-134 of that document, the writer indicates that there's limited to water infiltration and that sort of thing, it's number six in their conclusions, and it says, we conclude that this statement is highly speculative and not supported by the current conditions and assessments. Now, that's important to us because our position is simply this, that the exclusions here and their own expert, they cannot tell us what is excluded. They haven't done it. They don't have the proof for it, and even though this was dismissed in the beginning as a motion to dismiss 12B6, the fact of the matter is, is that they have the burden and they didn't meet it. There is nothing that their expert says that will conclude that there is an exclusion to this policy because they can't count on it. Mr. Ganser, to follow up on that point, building is still standing, is that correct? It is. Residents have all been, have all left the building, is that correct? They were given 15 minutes. And then the, so the current status is who takes care of the building? Is there some type of caretaker or? Well, no, we've been working with the city of Waukesha on this, and the, largely it's premised upon what happens here today with this argument and the ultimate decision of this court, but the city of Waukesha has actually already commenced the initiation of tearing down the building. So there were some matters here, they're apparently going to take it all down and then fold in the girders, and that should take care of tearing it down, it's an expensive process though. So we've been working with Waukesha for quite a while on this. So the real question in that matter is not that the work will get done, it's going to get done very soon, it's a matter of who's going to pay for it. So we've worked that out with them. Mr. Gantzer, you've alleged in your complaint that the damages are caused from two separate things, from the building's structural errors and the city's orders, and there is a specific exclusion in the policy for ordinances or law, it's called the ordinance or law exclusion. Why wouldn't the piece of your complaint that deals with the city's orders, not the separate piece about structural issues, but the city's orders be excluded under that provision? We believe that that provision, there are two parts to that provision, the first part is this, that the order wasn't like an original order, it's not like something like an eminent domain or something like that, it's simply that the engineers for the city of Waukesha saw that there was this problem and asked that the order be issued. So it's not the primary mover here, the primary mover is the fact that they determined the building had structural instability. The second part of that is what we've talked about is the fact that a public policy should not allow for there to be that provision in there, because as we said in our brief, that puts these homeowners in a position where they've got to determine whether they stay in the house, stay in those condos until it starts falling down so that they can get covered. Instead they comply with the lawful order of the city of Waukesha, safety order. So how can this insurance policy be countenanced when you look at it and it says, well if the building falls down, we'll cover you. But if somebody says the building might fall down, we won't. I think that that puts people at risk and that is contrary to public policy, that in fact in the McPhee case that I've cited in our brief, it talks about that. Mr. Danzer, can you clarify one argument you advanced in your brief? In a place or two you argued that the policy is providing illusory coverage. It is. Do you mean that in part or in whole? I think I mean it in part, but I'm very tempted to say in whole and the reason I say that is because if you look at their position in this case, virtually any common matters that might cause structural default here or loss of structural integrity, I don't know what they are, I don't know what they're covering. So yes, I've mentioned that in the brief, I do believe that it's partially illusory in that I can't identify when a structural problem would be paid for even though we think that it should be. So that's why I say it. What's the expectation of the policyholder here? They say, geez, our building is no good. We've been kicked out of our homes. Insurance must cover this and then we get to the policy and as I said, it's a pretty unusual policy. There is some coverage in there. We're not arguing about it so much, but just trying to discern the meaning of this. It's a form of additional coverage, collapse coverage, right? Right. And that, as best I can discern, that additional coverage on collapse would be like some kind of the facility just kind of caves in on itself or just, I mean, God forbid, people in it, but just falls down or something. Right. And we've seen that in Florida and then I think we recently saw that, was that in Nebraska or Iowa, where some of these buildings, these 1960s era buildings. The reason I point that out is that a building is not going to collapse unless there's a structural problem of some kind, absent like a natural disaster causing that. But that's not illusory, right? In that situation, if it just collapsed on itself, you'd say, we're going to invoke that additional coverage and submit a claim. That's right. That would take it out of the illusory. That's why I said in some respects it's partial, but that I was tempted to say that it was wholly illusory. But you're right. If it does collapse and people are still living there, then there would be coverage. But again, that points out what we've been saying from the beginning, that that's contrary to public policy. You can't put people in that position where they've got to make that determination. Can I trouble you with one more question? It'll help me to hear you in the courtroom articulate it. You make the argument that the rust exclusion is vague or ambiguous. Can you spell that out a little bit? Yes, I can. There are five uncovered instances where water can enter the building. The old inclusio unis exclusio alturis applies here. There are obviously some water intrusion events that are covered. The way the policy works, but we can't identify that cause. But if the policy works that way and it's included, it's an included water intrusion, then we've got two parts of the policy at odds, the rust provision and the water intrusion provision, and where in a policy those two things are at odds, then the policy holder should win. And that's exactly what the law is, and that's exactly what our argument is. All right, Mr. Kancher, we will be giving you rebuttal time. Thank you. Thank you, Your Honor. Let's move to Ms. Chapnick now on behalf of the appellee. Good morning, Your Honors. Michelle Chapnick on behalf of Travelers. May it please the court. There's no question that this entire situation has been devastating for the Homeowners Association, but this is a contract case, and contract cases aren't decided based on a motion. The contract has to be enforced. It was a specific contract that was issued, underwritten, and a premium was paid for certain risks, and the court in—all Wisconsin courts enforce their contracts. The central issue here—they make the argument this is an all-perils policy and all that, but the central issue in this case is we have to look at the insuring agreement. The insuring agreement of this policy says that there has to be direct physical loss caused by a covered cause of loss during the policy period. This is a 12B6 motion, so we're constrained to the pleadings, and we look to what they pled. The only quote-unquote loss that they've pled that occurred during the policy period, which started in May of 2021, is the issuance of this evacuation and raise order. Doesn't that go to Mr. Ganser's argument, the Hobson's choice for the residents of here we've got a safety order, but then we've got a policy that doesn't apply? Well, the thing is it's not a Hobson's choice. It's not that Travelers is saying, if you stayed in the building, we're going to pay for the building if you violate this order. That's not the issue here because there's no coverage even if they had stayed in the building and violated the order. I mean, if you look at the policy, it has a very specific exclusion for collapse. It doesn't cover collapse, and specifically, it doesn't cover the structural issues with structural integrity. It gives back a little bit of coverage under the additional collapse provision, and that little bit of coverage that it gives back is it must be abrupt, and it must be from one of the four subsections, but it specifically says, but the danger, the fact that the building is in danger of falling down, that doesn't come within the additional collapse coverage. So how does this work in a situation where a building abruptly collapses? There had not been a removal of the balcony and a location of the rust and the corrosion and all of that. The building just spontaneously just comes down. Nobody expected it that way, and then it turns out, lo and behold, upon examination, there was a major rust problem with some of the structural support of the building. How does the policy operate at that point in time? Well, you have to look at the different subsections of the additional coverage for collapse. Was there knowledge by the insureds of the defective condition? No, in my hypothetical, there's not. There's an abrupt collapse, and it turns out it was because the steel support beams had rusted out, but that's learned later. How does the policy work? The policy would look at... It would exclude... If the cause was just from the rust, it would exclude the cause from the rust, and you would have to look at the additional coverage for the collapse. The reason that I put that hypothetical out, it seems like the... This is not a point that Mr. Ganser makes, but it seems like the policy is a bit at odds with itself on this. In other words, an abrupt collapse that is later determined to be caused by rust. I don't know how the policy works. Well, if you look at the additional coverage for collapse, Your Honour, under Section 2A, if it's an abrupt collapse and it's caused by building decay that's hidden from view, so under your hypothetical, no knowledge of the building decay associated with rust, then there would be coverage under the additional coverage for collapse. But if it was known to the insured prior to the collapse, that's an exception under these circumstances. So in that hypothetical, the travellers would not invoke the rust exclusion? Well, the building decay, it would... I haven't found any of the arguments in the briefs, but there is case law... I'm just trying to understand the policy. I'm just trying to understand the way this thing is structured. Well, the way that it's structured is that, number one, they have to have a... And this is their burden. Direct physical loss from a covered causal loss in the policy period. They haven't alleged that. They've alleged building instability that occurred in 2020 that they knew about prior to the policy. That's not within the policy period, and that's what the district court noted. And then they've alleged that there's some balconies that were removed. That's not a loss. That was a decision to do some work on the building. There was no loss associated with balcony removal. But what they have alleged, if you look at paragraphs 39, 40 and 42 of their amended complaint, what they say is our loss is as a result of the issuance of the evacuation and the raise order. And the ordinance or law exclusion, as well as the governmental action exclusion, directly excludes that sort of circumstance. And it seemed to me the loss was the inability to live in the apartment anymore. That's their physical possession. But it's because of the issuance of the evacuation and raise order, which was a law that they had to comply with. It's because of the structural damage. I mean, if you say a direct physical loss, you might be pointing out the rust or some of the other things that it would fall within an exclusion, but it seems to me they've alleged these are our units where we lived and we can no longer live there. That sounds like a physical loss to me. Well, it has to be caused by something and the... But that's a separate provision. I'm just addressing your argument that the contract says and the policy says you have to have a direct physical loss. That sounds like a direct physical loss to me if you can't live in your home anymore, your unit. Well, it has to be from a risk of direct physical loss and what caused them to not be able to live in there, the issuance of the evacuation and the raise order. And that's the only thing that occurred within the policy period. Now, they point to two issues as to why they say the ordinance and law and governmental action exclusions don't apply. One being the fact that it's taken away by this legal liability provision, which doesn't exist in this policy. If you look at the forms of the policy, there's no legal liability coverage. So there's no removal of those exclusions. And by the way, these aren't... This is not a manuscripted policy. If you look at the bottom of the policy, it says it includes copyrighted material from Insurance Services Office. This is a typical policy that is issued across the country. This is... These provisions are not unique to this policy. And we've cited numerous cases in our brief that have upheld all of these exclusions that we've relied upon and that we've discussed here. So it's not like this is... And they've all been upheld as clear and unambiguous. I want to address very briefly the public policy argument that they make. And that is that... I guess what they're saying is that somehow we're not encouraging them to... or we're telling them that they can't... they shouldn't stay in the building or they should stay in the building and that would create coverage, but that's not the case. As I pointed out a little bit before, that the fact that whether they stayed in the building or didn't stay in the building, there's still no coverage under the circumstances of this case when the building is in, quote-unquote, danger of falling down or caving in. And the additional collapse coverage specifically spells that out. As to the issue of illusory... To be illusory, that means that coverage is never triggered under any circumstances. And that's not the case here. There's many risks that are covered by this policy. And there are circumstances, as we discussed a moment ago, under the additional collapse coverage that gives back some coverage where there is coverage. So it can't be illusory if there is some coverage that is being offered here. The... And if you had to describe that coverage, how would you describe it? The additional collapse coverage? No, the coverage that you said does exist for the risks. So... Can I answer? That's fine, absolutely. So under the circumstances here, had there been an actual collapse of the building, as Judge Scudder pointed out, and if it complied with one of the subsections of the additional collapse coverage and not just in danger of collapse, there might be coverage under those circumstances. But they're not under these circumstances. So we'd ask that the court affirm the district court. Thank you. Thank you very much, Ms. Chapnick. Mr. Ganser, we'll go back to you with three minutes for rebuttal. Thank you, Your Honor. The court, and I think it was Judge Brennan, talked about the Hobson's Choice here, and counsel indicate the problem here. She said that the homeowners had to honor the order rather than to stay, but that's exactly what the problem is here. They talk about it's not illusory, but the only example cited is the sudden collapse as a give-back, some kind of a give-back here in the policy. So I think that in many respects, it is an illusory policy. Well, there's some broader. So the point that wasn't made by trial, she just ran out of time, is damage from a bursting pipe, a fire, things like that. Nobody's arguing that it would not cover a fire. I agree. Right, so it's at least non-illusory as to certain very typical commercial losses. I would agree, and that's what I'm referring to only as structural losses and the intended and expected coverage by the policyholder here. No, you're clear on that. You're crystal clear. Thank you. Mr. Hanser, this isn't necessarily relevant to the legal issues, but did your clients have individual insurance that covered them here? They did, but I can tell you I'm representing a bunch of them and trying to get that. Those aren't paying because they're saying this is a common element type of a situation and we're not going to cover. So they've got their own homeowners, but nobody's covered. And I think one company did pay one relocation. That's about it. So as indicated, these people out of the house still owe on their mortgages, have to find alternate housing. There's a guy sitting here today is 80 years old, had to go back to work driving a concrete pump truck. So this has been rather devastating, and we recognize this as a contract matter. Um, as indicated by counsel, but at the same token, there's a real human toll here. And certainly the expectations of these people are consistent with the fact that they believe that they had coverage and all of these conflicting provisions, um, that may or may not apply. I think give credence to their position that we expected coverage and that coverage should be afforded in this case. There are just too many things that are in opposition here to, uh, say that this policy is a good policy written by a good lawyer who, uh, had it all well figured out. Thank you very much, Your Honors. Thank you very much, Mr. Ganser. Thank you very much, Ms. Chapnick.  We're gonna move on.